**Adan MAYSONET, a/k/a Luis Manuel Rivera, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 06–01–00024–CR.

Court of Appeals of Texas, Texarkana.

Submitted Oct. 1, 2002.

Decided Oct. 16, 2002.

---

Clement Dunn, Attorney At Law, Longview, for appellant.

William M. Jennings, Gregg County District Attorney, Longview, for appellee.

Before MORRISS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Adan Maysonet, a/k/a Luis Manuel Rivera, was convicted by a jury of possession of more than five pounds but less than 2,000 pounds of marihuana after being stopped for speeding. He was sentenced to fifteen years in a state correctional facility. No fine was assessed.

Maysonet contends the trial court erred in overruling his motion to suppress because the evidence found was the product of an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and Article I, § 9 of the Texas Constitution. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9.

Specifically, Maysonet asserts two points of error regarding the denial of his motion to suppress: 1) the State failed to establish a sufficient predicate for admitting radar evidence and consequently cannot show a reasonable suspicion for initially stopping Maysonet's vehicle, and 2) the search of Maysonet's vehicle and evidence obtained resulted from an unreasonably long detention.

### Fact Summary

Maysonet was traveling on Interstate 20 in a rental vehicle when drug interdiction Officer Robbie Benson stopped him for speeding.

At the suppression hearing, Benson testified that his primary basis for stopping Maysonet was a radar reading of seventy-four miles per hour in a seventy-mile-per-hour posted speed zone. (RR V.1 at 18). Also, Benson believed the sports utility vehicle driven by Maysonet was an out-of-state rental vehicle, which he testified indicated Maysonet was a possible drug courier. Shortly after the stop, Benson became more suspicious of drug activity. He based his suspicion on several "indicators." First, Maysonet was driving a rental vehicle that was neither registered in his name nor that he was authorized to drive. Second, Maysonet told Benson he planned to stop and see friends in Monroe, Louisiana. Benson, however, became suspicious because the vehicle was due back in Philadelphia, Pennsylvania, the next day, which at a minimum was over twenty hours of driving time away. Finally, Maysonet told Benson he worked at a 7–11 convenience store which, according to Benson, did not conform to the $167 per day rental fee paid for the 2000 Ford

Expedition. Benson then performed a routine driver's license inspection, as well as a criminal history check. Approximately fifteen minutes after the initial stop, Benson asked Maysonet if he had any weapons or narcotics in the vehicle, to which Maysonet responded: "No. Do you want to check?" Benson said, "Do you mind?" He then instructed Maysonet to open the back door, at which point he discovered marihuana in a tan "see through" plastic bag.

## Standard of Review

The standard of review for the trial court's ruling on a motion to suppress is abuse of discretion. *Oles v. State,* 993 S.W.2d 103, 106 (Tex.Crim.App.1999); *Freeman v. State,* 62 S.W.3d 883 (Tex. App.-Texarkana 2001, pet. ref'd). In a suppression hearing, the trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. The evidence should be viewed in the light most favorable to the trial court's ruling. *State v. Ballard,* 987 S.W.2d 889, 891 (Tex.Crim. App.1999); *Freeman,* 62 S.W.3d at 886. We should afford almost total deference to the trial court's determination of historical facts that the record supports, especially when the fact-findings are based on an evaluation of the witnesses' credibility and demeanor. *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App.2000); *Freeman,* 62 S.W.3d at 886.

■ We review the court's application of the law of search and seizure to those facts de novo. *Ross,* 32 S.W.3d at 856. Further, when the trial court does not file findings of fact, we should assume that the trial court made implicit findings that support its ruling, so long as those implied findings are supported by the record. *Id.* at 855. If the trial court's decision is correct on any theory of law applicable to the case, we should affirm the decision. *Id.* at 855–56.

## Radar Evidence

Maysonet contends the State failed to establish a sufficient predicate for admitting the results of the radar into evidence, under *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). Conversely, the State insists *Masquelette v. State,* 579 S.W.2d 478 (Tex.Crim.App. [Panel Op.] 1979), a case that predates *Kelly,* dispenses for all time with the requirement to establish the underlying reliability of radar.

In *Masquelette,* the Texas Court of Criminal Appeals held the State was not required to offer expert testimony about the underlying scientific basis of radar so long as the officer testifies he was trained both to operate the radar set and test it for accuracy. *Id.* at 480.

■ *Kelly* requires the proponent of expert testimony or evidence based on a scientific theory to show by clear and convincing evidence that the evidence is both *reliable* and *relevant* to assist the jury (or judge) in its fact-finding duty. *Kelly,* 824 S.W.2d at 573. To be reliable, evidence derived from a scientific theory must satisfy three criteria: 1) the underlying scientific theory must be valid; 2) the technique applying the theory must be valid; and 3) the technique must have been properly applied on the occasion in question. *Id.* Under Tex.R. Evid. 702, the State has the burden of proving all three criteria to the trial court, outside the presence of the jury, before the evidence may be admitted. *Id.* In *Hartman v. State,* 946 S.W.2d 60 (Tex.Crim.App.1997), the Texas Court of Criminal Appeals made it clear the *Kelly* test applies to all evidence based on a scientific theory, not just to evidence based on novel scientific theories. *Id.* at 63.

Maysonet asserts the State failed to prove the validity of the underlying scientific theory of radar—the first criteria of *Kelly*. Maysonet relies on *Ochoa v. State*, 994 S.W.2d 283 (Tex.App.El Paso 1999, no pet.), an El Paso Court of Appeals case interpreting *Kelly* in context of radar evidence.

*Ochoa* involved an appeal from a speeding ticket. In *Ochoa*, the State offered no evidence about the underlying theory of radar. Rather, it asserted that the standard articulated in *Masquelette* still governed the admissibility of radar. The El Paso Court of Appeals rejected this argument and concluded that: "although radar is a familiar concept, it is based on a scientific theory and therefore subject to proof of reliability and relevance under *Kelly*." *Id.* at 284. The court found that *Kelly* was not satisfied because the State offered no evidence to explain the theory underlying the radar calculation. *Id.*

In the present case, Officer Benson testified that he has used radar equipment since 1990 and had calibrated and tested his radar unit one day before he stopped Maysonet for speeding. Benson acknowledged that the gun itself calculates the speed of the object based on a signal that "is reflected and bounces back." Benson, however, could not explain radar's margin of error or the underlying scientific theory of radar. Further, the State offered no other evidence to show the validity of underlying scientific theory of radar or the technique applied.

The question we must decide is whether *Kelly*'s three-part inquiry abrogates *Masquelette*'s standard for the admissibility of radar evidence. We think it does not. *Masquelette* was decided before *Kelly* rejected the *Frye v. United States*, 293 F. 1013, 1014 (App.D.C.1923), "general acceptance" test as the sole criterion for determining the admissibility of scientific evidence.[1] *Kelly*, 824 S.W.2d at 572. However, *Kelly* does not require us to abandon the principles on which the court decided *Masquelette*. Although the court in *Kelly* held that the "general acceptance test" could no longer be dispositive on the issue of the admissibility of scientific evidence, it found it was still relevant. *Beard v. State*, —— S.W.3d ——, —— n. 6, 2002 WL 31116936, *2 n. 6 (Tex.Crim. App.2002) (citing *Kelly*, 824 S.W.2d at 572–73).[2]

Moreover, the Texas Court of Criminal Appeals held that the inquiry about the admissibility of scientific evidence under Rule 702 is substantively identical to the inquiry mandated by the United States Supreme Court in the federal system in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Jordan v. State*, 928 S.W.2d 550, 554 (Tex.Crim.App.1996). In *Daubert*, the United States Supreme Court also emphasized that general acceptance within the

---

1. Although *Frye* was never explicitly adopted in Texas, the Texas Court of Criminal Appeals used the "general acceptance" test on several occasions to review lower court decisions. *See Zani v. State*, 758 S.W.2d 233 (Tex.Crim. App.1988); *Reed v. State*, 644 S.W.2d 479 (Tex.Crim.App.1983); *Cain v. State*, 549 S.W.2d 707 (Tex.Crim.App.1977); *Romero v. State*, 493 S.W.2d 206 (Tex.Crim.App.1973).

2. The Texas Court of Criminal Appeals in *Kelly* discussed several "factors" available to courts to determine reliability of scientific evidence. They include, but are not limited to: 1) acceptance by the relevant scientific community, 2) qualifications of the expert, 3) literature concerning the technique, 4) the potential rate of error of the technique, 5) the availability of other experts to test and evaluate the technique, 6) the clarity with which the underlying theory or technique can be explained to the court, and 7) the experience and skill of the person applying the technique. *Kelly*, 824 S.W.2d at 573.

relevant scientific community is a factor that can bear on the inquiry. 509 U.S. at 594, 113 S.Ct. 2786.[3] The Supreme Court stressed that the reliability inquiry is "a flexible one." *Id.* at 595, 113 S.Ct. 2786.

When dealing with well-established scientific theory, *Kelly*'s framework provides courts flexibility to utilize past precedence and generally accepted principles of science to conclude its theoretical validity as a matter of law. To strictly construe *Kelly* otherwise would place a significant burden on judicial economy by requiring parties to bring to court experts in fields of science that no reasonable person would challenge as valid. If gravity were at issue, must a physicist testify to establish its underlying theory? We think not. Neither must a doctorate of particle physics explain the underlying theory of radar in every case involving radar. This is the spirit of *Masquelette.*

█ Radar's scientific validity is well settled in both the relevant scientific community and in Texas jurisprudence. In 1959 in *Wilson v. State*, 168 Tex.Crim. 439, 328 S.W.2d 311 (1959), the Texas Court of Criminal Appeals first looked at the reliability of the underlying scientific theory of radar. In *Wilson*, the court discussed several cases from other jurisdictions holding that the underlying theory of radar was sound. The court also referenced in great detail journals discussing specific scientific principles on which radar is based. *See id.* at 312–13 (discussing Doppler effect and microwave frequency refraction). Although the court ultimately reversed the appellant's conviction for speeding, it did so because the State failed to show that officers had properly operated the radar equipment on the particular occasion, not because the underlying theory of radar was unreliable.

Later, in *Cromer v. State*, 374 S.W.2d 884, 887 (Tex.Crim.App.1964), the Texas Court of Criminal Appeals, referring to *Wilson*, rejected the idea the State must call scientists to establish the principles by which speed is measured in cases involving radar.

Finally, in 1979 the Texas Court of Criminal Appeals in *Masquelette*, 579 S.W.2d at 481, pronounced once and for all that the State is not required to call an expert witness to establish the underlying theory of radar.

Although *Kelly* modified the pre-existing scheme for determining the admissibility of scientific evidence, it also provides flexibility to courts to apply both generally-accepted scientific principles and previous legal determinations.

In light of society's widespread use of radar devices, and considering other courts' acceptance of radar, we view the underlying scientific principles of radar as indisputable and valid as a matter of law.

Our holding today, however, does not mean radar evidence must not undergo rigorous scrutiny under both the second and third prongs of the *Kelly* test, only that the underlying scientific theory of radar is valid. The State must still establish that officers applied a valid technique and that it was correctly applied on the particular occasion in question.

In the present case, a trier of fact could have reasonably concluded that Officer Benson's testimony was sufficient to satisfy the second and third prongs of *Kelly*. Therefore, the trial court did not abuse its discretion when it admitted the radar evidence.

**3.** Other factors the Court cited were: 1) whether the theory or technique can be or has been tested, 2) whether the theory or technique has been subjected to peer review or publication, and 3) the known or potential rate of error.

## Reasonable Suspicion to Stop Maysonet

Having found the radar evidence admissible, we conclude Benson had reasonable suspicion to stop Maysonet.

 Circumstances short of probable cause to arrest may justify a temporary detention for the purpose of investigation. *Daniels v. State*, 718 S.W.2d 702, 704–05 (Tex.Crim.App.1986), *overruled on other grounds, Woods v. State*, 956 S.W.2d 33 (Tex.Crim.App.1997). To justify an investigative detention, the officer must have sufficient articulable facts, which, based on his experience and personal knowledge, and coupled with logical inferences from those facts, warrant the intrusion on the detainee. *Joseph v. State*, 865 S.W.2d 100, 102 (Tex.App.-Corpus Christi 1993, pet. ref'd).

██ The radar reading provided Officer Benson with a factual basis to determine that Maysonet was speeding. Derived from his past experiences with radar, Benson could have reasonably drawn a logical inference that Maysonet was speeding, therefore warranting his initial stop.

██ The determination of the presence of reasonable suspicion is a factual one and is made by considering the totality of the circumstances at the time of the stop. *Loesch v. State*, 958 S.W.2d 830, 832 (Tex. Crim.App.1997). The trial court did not abuse its discretion by denying Maysonet's motion to suppress based on lack of reasonable suspicion. We therefore overrule appellant's first point of error.

## Unreasonably Long Detention

Maysonet next contends the search of the rental vehicle he was driving resulted from an unreasonably long detention. Specifically, Maysonet contends that "[w]hatever the officer's suspicions may have been, the far reaching questions he asked [Maysonet] went well beyond any level of inquiry reasonably related to a stop for speeding."

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), provides the framework for our inquiry into this traffic stop. The question in *Terry* was whether it was always unreasonable for a peace officer to seize a person and subject him or her to a limited search unless there was probable cause for an arrest. *Id.* at 15, 88 S.Ct. 1868. The Court held that even though a "stop" and "frisk" was a search and seizure under the Fourth Amendment, such actions by peace officers could be reasonable. *Id.* at 16–17, 88 S.Ct. 1868. The Court adopted a two-part inquiry to determine the reasonableness of such an investigative detention: (1) whether the officer's action was justified at its inception; and (2) whether it was reasonably related in scope to the circumstances that justified the initial interference. *Id.* at 19–20, 88 S.Ct. 1868.

 Under part one, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. An objective standard is used to assess whether the intrusion was reasonable. The question is whether the facts available to the officer at the moment of the seizure or search would cause a man of reasonable caution to believe the action taken was appropriate. *Id.* at 21–22, 88 S.Ct. 1868. An investigative detention not based on reasonable suspicion is unreasonable and therefore violates the Fourth Amendment. As outlined above, a factfinder could reasonably find that Benson had reasonable suspicion to stop Maysonet for speeding.

 The second part of the *Terry* inquiry deals with the scope of the detention. The United States Supreme Court

noted that an investigative detention "must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Id.* at 25–26, 88 S.Ct. 1868. The scope of the search must be limited because a search reasonable at its inception may violate the Fourth Amendment because of its excessive intensity and scope. *Id.* at 18, 88 S.Ct. 1868. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Davis v. State,* 947 S.W.2d 240, 244 (Tex.Crim.App. 1997); *Freeman,* 62 S.W.3d at 887. A detention that is not temporary and reasonably related in scope to the circumstances that justified the interference is unreasonable and violates the Fourth Amendment. *Davis,* 947 S.W.2d at 243.

■ Maysonet essentially argues that Officer Benson's actions failed the second part of the *Terry* inquiry because the scope of the detention went beyond the initial purpose of the stop and was therefore unconstitutional. After stopping Maysonet, Benson approached the driver's side window and asked to see his driver's license and the car rental agreement, which Maysonet produced. Next, Benson questioned Maysonet about his travel plans and the vehicle's rental agreement. Thereafter, Benson ran a routine inspection on Maysonet's license, as well as a criminal history check.

Officer Benson stopped Maysonet to investigate the traffic violation. Once Benson concluded the investigation for the traffic violation, he could no longer lawfully detain or question Maysonet unless he had reasonable suspicion to believe another offense was being committed. *See Freeman,* 62 S.W.3d at 887. Maysonet contends that at no time did Benson develop reasonable suspicion that would justify detaining him beyond the scope of the stop for speeding. We must therefore determine the time Benson concluded the investigation of the traffic violation and when Benson first had reasonable suspicion to believe another offense was being committed.

■ Maysonet contends the "far reaching questions" Benson asked "went well beyond any level of inquiry reasonably related to a stop for speeding." In *Freeman,* we cited the United States Supreme Court opinion in *Michigan v. Summers,* 452 U.S. 692, 701 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), which quoted Professor W. LaFave's analysis on this point:

> It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted.... There is no reason to conclude that any of the investigative methods of the type just listed are inherently objectionable....

*Freeman,* 62 S.W.3d at 888 (quoting 3 W. LAFAVE, SEARCH AND SEIZURE § 9.2, pp. 36–37 (1978) (footnotes omitted)).

During the investigation, the officer had the right to ask to see the driver's license and insurance papers, information on the ownership of the vehicle, the driver's destination, and the purpose of the trip. *United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir.1993); *Mohmed v. State,* 977 S.W.2d 624, 628 (Tex.App.-Fort Worth 1998, no pet.). This was the scope of Officer Benson's inquiry.

According to Benson, it was during this initial questioning that he identified signs of drug courier activity. He based his suspicions on several "indicators." First, Maysonet was an unauthorized driver with an out-of-state rental vehicle. Benson's primary duty was working drug interdiction, and rental vehicles eastbound from Dallas with out-of-state license plates such as this one were the kind for which he looked. Second, it was nearly impossible for Maysonet to return the rental vehicle on time. The vehicle was due back in Philadelphia, Pennsylvania, the next day, which at a minimum was over twenty hours of driving time away. But according to Maysonet, he had at least one more planned stop, in to see friends in Monroe, Louisiana. Benson testified that in his experience, it is common for people to rent vehicles and either not return them or keep them until they are forced to return them.

Finally, Maysonet's employment at a 7–11 convenience store did not conform to the high price of the rental vehicle. If, during the course of a valid investigative detention, the officer develops a reasonable suspicion that the detainee was engaged in or soon would engage in criminal activity, a continued detention is justified. *See Davis*, 947 S.W.2d at 245. These facts were sufficient to give rise to a reasonable suspicion that Maysonet was engaged in criminal activity. The continued detention, therefore, was justified.

Maysonet also contends the search of the rental vehicle was improper because it resulted from an unreasonably long detention. While Maysonet has standing to challenge the constitutionality of the seizure or detention of his own person, he lacks standing to challenge the search of the rental vehicle. *See Freeman,* 62 S.W.3d at 889. Maysonet presents no argument on the issue of standing. A defendant may have standing to challenge the determinative reasonableness of the seizures involved in his own detention and yet lack standing to challenge a search of the vehicle. *Freeman,* 62 S.W.3d at 889; *see also* 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 4.52, at 203 (2d ed.2001). That is what happened here.

An accused has standing under both the Fourth Amendment and Article I, § 9 to challenge the admission of evidence obtained by a governmental intrusion only if he had a legitimate expectation of privacy in the place invaded. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App. 1996) (citing *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). The accused, because he has greater access to the relevant evidence, has the burden of proving facts establishing a legitimate expectation of privacy. *Villarreal,* 935 S.W.2d at 138. To carry this burden, the accused must normally prove: (a) that by his conduct, he exhibited an actual, subjective expectation of privacy, i.e., a genuine intention to preserve something as private; and (b) that circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. *Id.* (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

A defendant has standing to challenge the search of an automobile he or she does not own if he or she has permission from the owner to drive the vehicle, or if he or she has permission from some other person authorized to give such permission, or if he or she otherwise has a legal right to use and control the vehicle. *Nite v. State,* 882 S.W.2d 587, 590–91 (Tex. App.-Houston [1st Dist.] 1994, no pet.) (defendant had standing to challenge search of the car registered to his wife in part

because of community property laws); *Stine v. State,* 787 S.W.2d 82, 85 (Tex. App.-Waco 1990, pet. ref'd) (defendant who had authority to test drive vehicles left for repairs at a car repair shop had standing to challenge the search of the car which he used to commit murder).

■ A person, however, driving a rental vehicle does not have standing to challenge a search of the vehicle if driving the vehicle is prohibited by the vehicle rental agreement, even if he or she has the permission of the person who rented the vehicle. *See United States v. Boruff,* 909 F.2d 111, 117 (5th Cir.1990); *Rovnak v. State,* 990 S.W.2d 863, 871 (Tex.App.-Texarkana 1999, pet. ref'd) (following *Boruff*). *Contra United States v. Lee,* 898 F.2d 1034, 1038 (5th Cir.1990) (driver of the rental truck, who had permission from the lessee but not the lessor, had standing to challenge the search). Here, Maysonet was driving a rental vehicle, and he was not listed as a driver on the rental agreement. Further, no one in the vehicle was a registered driver. No evidence was introduced to show that Maysonet had any interest in or right to use the vehicle, nor is there even a bare assertion that he had such a right.

Therefore, Maysonet failed to demonstrate he had a legitimate expectation of privacy in the rental vehicle. Although Maysonet had standing to challenge the detention, which was constitutionally reasonable, he lacked standing to challenge the search of the rental vehicle. For these reasons, we overrule Maysonet's second point of error.

The judgment is affirmed.