In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00142-CR


______________________________




ERRICK CHARLES CHEEKS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 15th Judicial District Court


Grayson County, Texas


Trial Court No. 056016-15




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 After a routine traffic stop led to the discovery of 8.8 pounds of cocaine, Errick Charles
Cheeks pled guilty to possession of cocaine, with intent to deliver. (1) Cheeks filed a motion to suppress
the cocaine, alleging that his continued detention after the conclusion of the traffic stop while
awaiting the arrival of a canine unit violated his constitutional rights. The sole question on appeal
is whether the trial court abused its discretion in determining the arresting officer had reasonable
suspicion to further detain Cheeks for forty minutes after the traffic citation issued. We affirm the
judgment of the trial court. 

I. Factual Background 

 On Halloween evening in 2006, Trooper John Shaw observed the driver of a GMC Yukon fail
to signal a lane change when attempting to pass another vehicle. After passing, the driver of the
Yukon cut back in front of the other vehicle, causing the driver to "hit his brakes to keep from being
hit." Shaw pulled the driver of the Yukon over based on these traffic violations. As he approached
the passenger side door, Shaw noticed a faint odor of marihuana. Because the window was rolled
down and the Yukon contained numerous air fresheners, the odor immediately faded. Shaw
discovered a Nextel walkie-talkie, which he believed could be used to communicate with other "trail"
vehicles ensuring the safe transportation of illegal drugs. 

 As a matter of routine, Shaw asked the driver for his license or identification card. The driver
stated that he never had a driver's license, and was unable to produce any identification. Nineteen-year-old passenger Allison Craft gave Shaw two different Oklahoma identification cards. One of the
cards depicted another woman named April Bailey, who is over twenty-one years of age, looks like
Craft, and presumably facilitated Craft in the purchase of alcoholic beverages. At that point, Shaw
asked the driver to step out and decided to question him and Craft separately. 

 Shaw asked a nervous Craft where she was coming from. At first, she claimed to be coming
from Oklahoma, but after Shaw began to explain that could not be true since they were driving 
northbound on Highway 75 toward Oklahoma, Craft told him they came from Dallas where they spent
one night visiting with friends. Craft indicated they were traveling with others. Because Craft gave
Shaw a "fake ID," Shaw contacted the Oklahoma Department of Public Safety (ODPS) Fraud Unit
to ask them what they wanted him to do with Craft and with April Bailey's identification card. When
further questioned, Craft told Shaw that, while the driver was her boyfriend, she did not know his
name. 

 Shaw interrogated the driver and eventually learned his name was Errick Cheeks. Cheeks,
who also appeared nervous, said they were coming from Dallas where they spent two to three nights
at his grandmother's house. Shaw ran a check on Cheeks' name and discovered he had previous drug
convictions, had been found in possession of a dangerous weapon, and had outstanding warrants for
traffic violations in Dallas County. At this point, because he had difficulty in identifying Craft and
Cheeks, smelled marihuana, noticed numerous air fresheners, and heard inconsistent stories, Shaw
believed that Cheeks and Craft were transporting illegal narcotics. Also noting that Cheeks was
communicating with someone by walkie-talkie, Shaw's suspicions about drug trafficking, and the
possibility that a "trail" vehicle was nearby, were raised. He called for back-up and began to try to
identify the owner of the Yukon. 

 Cheeks produced an insurance card indicating the Yukon did not belong to him or Craft. 
When prompted, Cheeks stated the Yukon belonged to his sister, who was on her way to the scene
of the traffic stop. Shaw ran a Vehicle Identification Number check that indicated the Yukon actually
belonged to a Curtis McMenafy. Thirty-three minutes into the traffic stop, Shaw issued Cheeks a
warning for failure to signal and turn, and for cutting in and out of traffic. Cheeks was also issued
a citation for failing to have a driver's license. Shaw clarified that Cheeks and Craft were not free to
drive away from the scene because Cheeks did not have a driver's license and Shaw was waiting to
hear from the ODPS Fraud Unit regarding Craft. 

 Shaw asked Cheeks for consent to search the vehicle. Initially, Cheeks consented, but when
Shaw told him to step out of the Yukon, Cheeks withdrew consent. Shaw called several counties in
an attempt to locate a canine unit. While Shaw was waiting for the canine to arrive, Craft told him
the Yukon belonged to a woman who was waiting in a burgundy Chevrolet Impala in a nearby parking
lot. Shortly, the Impala that Shaw believed was a "trail" vehicle pulled up behind Shaw, and the
driver proclaimed the Yukon was hers. Knowing that the Yukon belonged to Curtis McMenafy,
Shaw asked the driver of the Impala to wait for the arrival of the canine unit. Approximately forty
minutes passed from the time the citation issued until the canine unit arrived. The canine walked
around the Yukon and alerted on the driver's side. A search revealed marihuana residue and 8.8
pounds of cocaine. Cheeks was promptly arrested, and a search of the trailing Impala produced
another walkie-talkie and a large amount of cash. 

 Arguing that Shaw unreasonably and unconstitutionally detained him after the initial purpose
of the traffic stop was complete, i.e., after the traffic warning and citations were issued, Cheeks filed
a motion to suppress with the trial court. At the hearing, the trial court found that Shaw had
reasonable suspicion to further detain Cheeks after the conclusion of the initial traffic stop, and held
that the forty-minute delay while waiting for the canine unit to arrive was reasonable. We affirm. 

II. Standard of Review

 A decision to grant or deny a motion to suppress is generally reviewed for abuse of discretion. 
Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999); Villarreal v. State, 935 S.W.2d 134, 138
(Tex. Crim. App. 1996); Maysonet v. State, 91 S.W.3d 365, 369 (Tex. App.--Texarkana 2002, pet.
ref'd). Because a trial court is the exclusive trier of fact and judge of witness credibility at a
suppression hearing, we afford almost total deference to its determination of facts supported by the
record. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); State v. Ross, 32 S.W.3d
853, 856 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We
also afford such deference to a trial court's ruling on application of law to fact questions, also known
as mixed questions of law and fact, if the resolution of those questions turns on an evaluation of
credibility and demeanor. Villarreal, 935 S.W.2d at 138. 

 However, we review de novo those questions not turning on credibility and demeanor. 
Hernandez v. State, 957 S.W.2d 851 (Tex. Crim. App. 1998). For this reason, we review de novo the
trial court's application of the law of search and seizure to the facts. Ross, 32 S.W.3d at 856;
Maysonet, 91 S.W.3d at 369. Since all evidence is viewed in the light most favorable to the trial
court's ruling, we are obligated to uphold it on a motion to suppress if that ruling is supported by the
record and is correct under any theory of law applicable to the case. Carmouche, 10 S.W.3d at 327;
Ross, 32 S.W.3d at 855-56; State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999);
Maysonet, 91 S.W.3d at 369. Further, when the trial court does not file findings of fact, we should
assume that the trial court made implicit findings that support its ruling, so long as those implied
findings are supported by the record. Ross, 32 S.W.3d at 855-56.

III. Suppression Hearing 

 A. The Law of Search and Seizure 

 "No right is held more sacred, or is more carefully guarded, by the common law" than the
freedom from unreasonable search and seizure. Terry v. Ohio, 392 U.S. 1, 9 (1968). A search which
is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity
and scope. Id. at 18. Thus, it is imperative that the scope or purpose of a search be strictly tied to and
justified by the circumstances which rendered an invasion permissible in the first place. Florida v.
Royer, 460 U.S. 491, 500 (1983); Terry, 392 U.S. at 19-20, 29. 

 However, an officer may request consent to search a vehicle after the purpose of an initial
traffic stop is accomplished only if it is reasonable under the circumstances and the officer has not
conveyed that compliance to the consent request is required. (2) Davis v. State, 947 S.W.2d 240, 245
(Tex. Crim. App. 1997); State v. Pierce, No. 05-07-00828-CR, 2008 WL 4075031, at *2-3 (Tex.
App.--Dallas  Sept.  4,  2008,  no  pet.)  (mem.  op.,  not  designated  for  publication);  Powell  v.
State, 5. S.W.3d 369, 377 (Tex. App.--Texarkana 1999, pet. ref'd). If consent is refused, any
continued detention must be based on articulable facts which, taken together with rational inferences
from those facts, "would warrant a person of reasonable caution in the belief that a continued
detention was justified, i.e., the detainee was or would soon be engaged in criminal activity." Herrera
v. State, 80 S.W.3d 283, 288 (Tex. App.--Texarkana 2002, pet. ref'd). "In other words, once the
purpose of the original detention has been effectuated, any continued detention must be supported by
some additional reasonable suspicion." Simpson v. State, 29 S.W.3d 324, 327 (Tex. App.--Houston
[14th Dist.] 2000, pet. ref'd). 

 The further detention must be temporary and last no longer than is necessary to effectuate the
initial purpose of the stop. (3) Royer, 460 U.S. at 500; Cisneros v. State, 165 S.W.3d 853, 859 (Tex.
App.--Texarkana 2005, no pet.). The United States Supreme Court has not defined a bright-line rule
in evaluating whether the duration of an investigative detention is unreasonable. United States v.
Sharpe, 470 U.S. 675 (1985). Instead, common sense and ordinary human experience govern over
rigid criteria. Id. "Obviously, if an investigative stop continues indefinitely, at some point it can no
longer be justified as an investigative stop. But our cases impose no rigid time limitation on Terry
stops." Id. To impose a rigid time limit "would undermine the equally important need to allow
authorities to graduate their responses to the demands of any particular situation." Id. at 686. 
Thus,"[t]he propriety of the stop's duration is judged by assessing whether the police diligently
pursued a means of investigation that was likely to dispel or confirm their suspicions quickly," while
using the least intrusive means available. Cisneros, 165 S.W.3d at 859 (quoting Davis, 947 S.W.2d
at 245). 

 B. Shaw Had Reasonable Suspicion to Further Detain Cheeks

 After stopping Cheeks for a traffic violation, Shaw could rely on all of the facts ascertained
during the course of his contact with Cheeks and Craft to develop articulable facts justifying further
detention. Sims v. State, 98 S.W.3d 292, 294 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd). We
review the totality of these circumstances in determining that Shaw had a particular and objective
basis to suspect that Cheeks was transporting drugs. Id.; Haas v. State, 172 S.W.3d 42, 52 (Tex.
App.--Waco 2005, pet. ref'd). 

 Shaw smelled marihuana as soon as he approached the Yukon. He spotted numerous air
fresheners, which could be used to mask the smell of drugs. A nervous Cheeks was unable to produce
any identification, and his nervous passenger was found with fake identification. Separate questioning
of Cheeks and Craft resulted in inconsistent stories about where they were coming from and how long
they had been there. When Craft suggested they were traveling with others and Cheeks claimed his
sister was on the way to the scene of the traffic stop, Shaw suspected that the walkie-talkie was being
used to communicate with possible "trail" vehicles. A check run on Cheeks' name confirmed he had
previously been convicted of a drug-related offense. Both Cheeks and Craft lied about the owner of
the Yukon. Shaw asked for consent to search the vehicle immediately after the citation was issued,
which was initially given but immediately withdrawn. The trial court correctly concluded Shaw was
reasonable in suspecting Cheeks was transporting illegal narcotics. 

 In assessing whether a detention is too long in duration to be justified as an investigative stop,
we examine whether Shaw diligently pursued a means of investigation likely to confirm or dispel this
suspicion. Sharpe, 470 U.S. at 686. Immediately after consent to search was withdrawn, Shaw called
the Sherman Police Department, and Colbert, Calera, Val Alstyne, Denison, Bryan, Durant, and
Grayson Counties to ask for availability of a canine unit. Shaw spent fourteen minutes attempting to
locate a canine before receiving word that Officer Tim Gann was picking up a canine at the
veterinarian's office that could conduct the free-air search or sniff. The canine unit arrived
approximately thirty minutes after Shaw received word that it was on its way. Cheeks was arrested
approximately seventy-three minutes after the initial traffic stop. We conclude that Shaw diligently
pursued a means of investigation likely to dispel or confirm his suspicion quickly while using the least
intrusive means available. Thus, the trial court did not err in determining the duration of the stop was
reasonable. Strauss v. State, 121 S.W.3d 486, 492 (Tex. App.--Amarillo 2003, pet. ref'd) (holding
seventy-five-minute lapse between time officer first stopped defendant and arrival of drug dog was
reasonable); Josey v. State, 981 S.W.2d 831, 841 (Tex. App.--Houston [14th Dist.] 1998, pet. ref'd)
(ninety-minute lapse between time officer first stopped defendant and arrival of drug dog was
reasonable); Haas, 172 S.W.3d at 53 (citing United States v. Frost, 999 F.2d 737, 741-42 (3d Cir.
1993) (wait of almost one hour for drug dog was reasonable)). IV. Conclusion

 Because Shaw had reasonable suspicion to detain Cheeks, and the duration of Cheeks' continued
detention was reasonable, we affirm the judgment of the trial court denying the motion to suppress. 





 Jack Carter

 Justice


Date Submitted: January 23, 2009

Date Decided: January 30, 2009 


Do Not Publish
1. Originally appealed to the Fifth Court of Appeals, this case was transferred to this Court by
the Texas Supreme Court pursuant to its docket equalization efforts. See Tex. Gov't Code Ann.
§ 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Fifth Court of
Appeals and that of this Court on any relevant issue. See Tex. R. App. P. 41.3.
2. The State did not contest that the initial purpose of the traffic stop was complete when
citations were issued, despite the fact that Shaw never heard from the ODPS Fraud Unit regarding
Craft and the fraudulent identification card. 
3. Cheeks has not contested the propriety of the initial traffic stop.