ACCEPTED
06-14-00207-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/15/2015 11:32:04 AM
DEBBIE AUTREY
CLERK

NO. 06-14-00207-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT OF TEXAS
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
4/15/2015 11:32:04 AM
DEBBIE AUTREY
Clerk

## KARL PATRICK HOULDITCH

### vs.

## THE STATE OF TEXAS

Appealed from the 71st District Court of Harrison County, Texas
Trial Cause No. 13-0263X

## BRIEF FOR APPELLANT KARL PATRICK HOULDITCH

LAW OFFICES OF HOUGH-LEWIS ("LEW") DUNN
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
Texas State Bar No. 06244600
Email: dunn@texramp.net
Tel. 903-757-6711
Fax  903-757-6712
Counsel for Appellant

*Appellant Respectfully Requests Oral Argument*

## STATEMENT REGARDING PARTIES TO THIS APPEAL
### [RULE 38.1(a) TEX.R.APP. PROC.]

KARL PATRICK HOULDITCH, Appellant

Matthew C. Harris, Attorney at Law
Texas State Bar No. 24059904
P.O. Box 4373
Longview, TX 75606
Counsel for Appellant at Trial

Shawn Connally, Assistant Criminal District Attorney
Texas State Bar No. 24051899
P.O. Box 776
Marshall, TX 75671
Counsel for the State at Pre-Trial Hearing

Coke Solomon, Criminal District Attorney
Texas State Bar No. 24041954
P.O. Box 776
Marshall, TX 75671
Counsel for the State at Plea and Punishment Hearing

Hough-Lewis ("Lew") Dunn, Attorney at Law
Texas State Bar No. 06244600
P.O. Box 2226
Longview, TX 75606
Counsel for Appellant on Appeal

Timothy J. Cariker, Assistant Criminal District Attorney
Texas State Bar No. 24009942
P.O. Box 776
Marshall, TX 75671
Counsel for the State on Appeal

**TABLE OF CONTENTS**

PAGE

STATEMENT REGARDING PARTIES TO THIS APPEAL .. ii

TABLE OF CONTENTS ……………………………………. iii

INDEX OF AUTHORITIES ………………………………… vi

STATEMENT OF THE CASE ……………………………… x

ISSUES PRESENTED ……………………………………. xi

STATEMENT OF FACTS ………………………………….. 2

    Hearing on Motion to Suppress ………………………. 2

    Michael Dawson ……………………………………….. 2

    Kevin Brownlee ……………………………………… 5

    Guilty Plea ………………….………………………… 14

    Hearing on Motion for New Trial ……………………. 20

SUMMARY OF THE ARGUMENT ………………………. 22

ARGUMENT AND AUTHORITIES ……………………….. 23

FIRST ISSUE, RESTATED ……………………………… 23

THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS. THE EVIDENCE CONTAINED IN THE AFFIDAVIT WAS STALE AND/OR UNRELIABLE, THEREBY FAILING TO ESTABLISH PROBABLE CAUSE FOR ISSUANCE OF THE WARRANT

# TABLE OF CONTENTS (CONT'D)

PAGE

SECOND ISSUE, RESTATED ………………………….. 23

THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS, SINCE DETECTIVE BROWNLEE WAS AN EMPLOYEE OF A STATE LAW ENFORCEMENT AGENCY AND THE "SILVER PLATTER" DOCTRINE (OR ITS REVERSE) DOES NOT APPLY; HENCE, STATE LAW, NOT FEDERAL LAW, GOVERNED THE VALIDITY OF THE SEARCH WARRANT

THIRD ISSUE, RESTATED ………………………………. 33

THE TRIAL COURT SHOULD HAVE SUPPRESSED APPELLANT'S STATEMENTS TO LAW ENFORCEMENT ON MAY 22, 2013, SINCE HE WAS IN CUSTODY AND NEVER GIVEN HIS MIRANDA WARNINGS PRIOR TO SPEAKING WITH THE OFFICERS

FOURTH ISSUE, RESTATED ………………………………. 37

THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE ASSESSMENT OF THIRTY CONSECUTIVE SENTENCES OF EIGHT YEARS EACH DID NOT OFFEND THE EIGHTH AMENDMENT

PRAYER FOR RELIEF …………………………………. 42

CERTIFICATE OF DELIVERY …………………………. 43

CERTIFICATE OF COMPLIANCE ……………………. 43

# TABLE OF CONTENTS (CONT'D)

APPENDIX I: MOTION TO SUPPRESS

APPENDIX II: SUMMARY OF EXHIBITS

# INDEX OF AUTHORITIES

CASES                                                                   PAGE

*Bernard v. State*, 807 S.W. 2d 359 ……………………………………   32
    (Tex. App. – Houston [14th Dist.] 1991, no pet.)

*Carmouche v. State*, 10 S.W.3d 323 (Tex, Crim. App. 2000)………   24, 25

*Ellis v. State*, 722 S.W.2d 192 …………………………………………..   32
    (Tex. App. – Dallas 1986, no pet.)

*Gonzalez v. State*, 768 S.W.2d 436 …………………………………….   30
    (Tex. App. – Houston [1st Dist.] 1989, no. pet.)

*Green v. State*, 799 S.W.2d 756 (Tex. Crim. App. 1990) ………….   30

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ………………………..   38

*Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991) ……….   26

*Hubert v. State*, 312 S.W.3d 554 (Tex. Crim. App. 2010) ………...   24

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983)……………   24

*Lamarre v. State,* 2013 WL 781778 ……………………………………   39
    (Tex. App. – San Antonio, Mem. Op. No. 04-11-00618-CR,
    March 1, 2013)

*Lockett v. State*, 879 S.W.2d  184 …………………………………….   31, 32
    (Tex. App. – Houston [1st Dist.] 1994, pet. ref'd)

*Lockyer v. Andrade*, 538 U.S. 63 (2003) …………………………..   38

*Lustig v. United States*, 338 U.S. 74 (1949) ………………………..   26

*Maxwell v. State*, 73 S.W.3d 278 (Tex. Crim. App. 2002) ……....   24

CASES (CONT'D)                                           PAGE

*Maysonet v. State*, 91 S.W.3d 365 …………………………….. 25
    (Tex. App. – Texarkana 2002, pet. ref'd)

*McCraw v. State*, 117 S.W.3d 47 ……………………………. 35
    (Tex. App. – Fort Worth 2003, pet. ref'd)

*McGoldrick v. State*, 2007 WL 2462035 …………………………. 39, 40
    (Tex. App. – Austin, Mem. Op. No. 03-07-00132-CR,
    Aug. 29, 2007).

*Miranda v. Arizona*, 384 U.S 436 (1966) ………………………… 34

*Neal v. State*, 256 S.W.3d 264 (Tex. Crim. App. 2008) ………….. 24

*Reynolds v. State*, 430 S.W.3d 467 …………………………….22, 39, 40, 41
    (Tex. App. – San Antonio 2014, no pet.)

*Saldano v. State,* 70 S.W.3d 873 (Tex. Crim. App. 2002) ………….. 38

*Shepherd v. State*, 273 S.W.3d 681(Tex. Crim. App. 2008) ……… 24

*Solem v. Helm*, 463 U.S. 277 (1983) ……………………………… 37, 41

*State v. Ballard*, 987 S.W.2d 889 (Tex. Crim. App. 1999) ……….. 25

*State v. Castleberry*, 332 S.W.3d 460 (Tex. Crim. App. 2011) …. 25

*State v. Kurtz*, 152 S.W.3d 72 (Tex. Crim. App. 2004) …………. 24

*State v. Mollica*, 114 N.J. 329, 554 A.2d 1315 (N.J. 1989) …….. 27, 32

*State v. Ross*, 32 S.W.3d 853 (Tex. Crim. App. 2000). …………… 24, 25

CASES (CONT'D)                                                    PAGE

*State v. Toone*, 823 S.W.2d 744 …...…………….……………….. 26, 27, 32
        (Tex. App. – Dallas 1992), *aff'd on other grounds*,
        872 S.W.2d 750 (Tex. Crim. App. 1994)

*Tijerina v. State*, 334 S.W.3d 825 …………………………………. 36
        (Tex. App. – Amarillo 2011, pet. ref'd).

*Washburn v. State*, 235 S.W.3d 346 ………………………………….. 35
        (Tex. App. – Texarkana 2007, no pet.)

STATUTES

U.S. CONST.

        Fourth Amendment …………………………………………… 23, 25, 26

        Fifth Amendment …………………………………………. 23, 34

        Sixth Amendment …………………………………………... 23

        Eighth Amendment ………………………………………… 37, 38, 39, 42

        Fourteenth Amendment ………………………………………… 23

TEX. CONST.

        Art. 1, Section 9 …………………………………………. 23, 25, 26

        Art. 1, Section 10 …………………………………………. 23, 34

        Art. 1, Section 13 …………………………………………. 38, 42

        Art. 1, Section 19 ………………………………………….. 23

STATUTES (CONT'D)                                      PAGE

TEXAS CODE CRIM. PROC.

     Art. 1.05 …………………………………………………………… 34

     Art. 1.09 …………………………………………………………… 38

     Art. 18.06 ……………………………………………………….. 24, 30

     Art. 18.07 ……………………………………………………….. 24, 30

     Art. 38.22 ……………………………………………………….. 24, 34

     Art. 38.23 ……………………………………………………….. 24

RULES

TEX. R. APP. PROC.

     Rule 38.1(a) ………………………………………………………. ii

     Rule 44.2(a) ……………………………………………………… 36

## STATEMENT OF THE CASE

Appellant was charged with thirty (30) counts of possession of child pornography. After a Motion to Suppress was heard and denied, he pleaded guilty on an "open plea" to the trial court and was sentenced to eight (8) years confinement in TDCJ on each of the thirty counts, which were to run consecutively. Appeal was perfected and now comes before this Honorable Court.

# ISSUES PRESENTED

**FIRST ISSUE**: THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS. THE EVIDENCE CONTAINED IN THE AFFIDAVIT WAS STALE AND/OR UNRELIABLE, THEREBY FAILING TO ESTABLISH PROBABLE CAUSE FOR ISSUANCE OF THE WARRANT

**SECOND ISSUE**: THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS, SINCE DETECTIVE BROWNLEE WAS AN EMPLOYEE OF A STATE LAW ENFORCEMENT AGENCY AND THE "SILVER PLATTER" DOCTRINE (OR ITS REVERSE) DOES NOT APPLY; HENCE, STATE LAW, NOT FEDERAL LAW, GOVERNED THE VALIDITY OF THE SEARCH WARRANT

**THIRD ISSUE**: THE TRIAL COURT SHOULD HAVE SUPPRESSED APPELLANT'S STATEMENTS TO LAW ENFORCEMENT ON MAY 22, 2013, SINCE HE WAS IN CUSTODY AND NEVER GIVEN HIS MIRANDA WARNINGS PRIOR TO SPEAKING WITH THE OFFICERS

**FOURTH ISSUE**: THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE ASSESSMENT OF THIRTY CONSECUTIVE SENTENCES OF EIGHT YEARS EACH DID NOT OFFEND THE EIGHTH AMENDMENT

NO. 06-14-00207-CR

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT OF TEXAS
AT TEXARKANA

**KARL PATRICK HOULDITCH**

**vs.**

**THE STATE OF TEXAS**

Appealed from the 71st District Court of Harrison County, Texas
Trial Cause No. 13-0263X

**BRIEF FOR APPELLANT KARL PATRICK HOULDITCH**

TO THE HONORABLE JUSTICES OF THE SIXTH COURT OF APPEALS:

COMES NOW KARL PATRICK HOULDITCH, APPELLANT, on appeal in Cause No. 13-0263X, and the "Judgment of Conviction" of the District Court for the 71st Judicial District of Harrison County, Texas, wherein he was found guilty of thirty (30) counts of the offense of possession of child pornography, a third degree felony, and sentenced by the Honorable Brad Morin, to eight (8) years on each count in the Texas Department of Criminal Justice, Institutional Division, to run consecutively, in which Appellant was Defendant, and in which the State of Texas was plaintiff and is now Appellee.

1

**STATEMENT OF FACTS**

HEARING ON MOTION TO SUPPRESS

On August 29, 2014, Appellant appeared with his counsel on the matter of his "Motion to Suppress" (CR 30 ff.). The State produced the search warrant and filed it as State's Exhibit #1, without objection (1 MST 5). Appellant then went forward with his proof, contesting the validity of the search warrant:

Michael Dawson

Michael Dawson testified that he was a Special Agent for the U. S. Secret Service, from Tyler (1 MTS 6). He gave details of his employment and discussed his involvement in the case (1 MTS 6-7). He and other persons worked on drafting the affidavit for obtaining a Federal warrant; those other persons were Detective Brownlee and the U.S. Attorney (1 MTS 7). Some of the sections of the affidavit were "boiler plate" verbiage used in obtaining this sort of search warrant (1 MST 8). However, the specifics dealing with Appellant were supplied by Detective Brownlee, such as the specific files with the suspected contraband, and the information about previous investigations about the particular address at 3368 Rupe Huffman Road (1 MTS 9).

Prior to obtaining the warrant on May 14, 2013, Agent Dawson had not had contact with Appellant (1 MTS 9); Agent Dawson based his knowledge of what Appellant was doing upon the information he received from Detective

Brownlee (1 MTS 10). There was then a discussion of IP addresses and where the computer would be located with an IP address. Agent Dawson was not sure if multiple houses could have computers containing the same IP address; he could not rule that out (1 MTS 11). He stated further that he had no computer forensic training, but had received training in basic issues, like IP address, and internet investigation; however, he again stated that he had no forensic training (1 MTS 11-12).

Agent Dawson went on to say that he had a course called "Network Plus," and on-the-job training in case law, working investigations, talking to experts, having forensic people tell him about the specifics of peer-to-peer network. (1 MTS 12). There were two types of IP address: static (not changing; staying the same) and dynamic (subject to change at any time). (1 MTS 13). The witness was unable to say whether or not the IP address in the present case was static or dynamic; nor was he able to say whether or not it was common for residential users to have static IP addresses (1 MTS 13).

Next, Agent Dawson was questioned about why the subpoena for records for the IP address was focused on the time from March 16, 2013, to April 24, 2013. He replied that those were the times that Det. Brownlee "was able to witness through the peer-to-peer network what was happening" (1 MTS 14). The date the warrant was issued was May 24, 2013 (1 MTS 14). Agent Dawson did not know if during that interim the IP address had changed users;

3

he did not know if the IP address had been reissued after that time and could not rule that out     (1 MTS 14-15).

Once the warrant was issued by the magistrate judge, Agent Dawson's involvement in the investigation ceased (1 MTS 15-16). He confirmed that it was accurate to say that his involvement in the investigation was limited to providing some background technical information in the affidavit and presenting an application for search warrant to U. S. Magistrate Judith Guthrie (1 MTS 16).

According to Agent Dawson, a "peer-to-peer network" is where people share files, offering files for upload, and downloading files from people who are offering them. Examples of those were such names as eDonkey, uTorrent, and Gnutella. To access the network, a person had to have some sort of software compatible with the network that he wanted to get on (1 MTS 16).

The witness then discussed two of the networks, eDonkey and Gnutella as two different peer-to-peer networks: each had its own software compatible with that particular network (1 MTS 17). In a peer-to-peer network there are multiple users, each of whom has a "sharing folder" and other users can generally access whatever is in another user's share folder by clicking a title and starting to download that file (1 MTS 18-19). Asked whether or not the same title/file can be downloaded from multiple files at the same time, Agent Dawson disagreed with that, stating that there was only one person from whom

4

a file was downloaded (1 MTS 19-20). However, in his affidavit he stated that "files which are selected to be downloaded can come from multiple sources, i.e., pieces of the desired file are downloaded from different users and then the pieces are reassembled on the requesting user's computer. Peer-to peer networks can only succeed if all the pieces come from the original file. It's not possible for other users to upload files to another person's computer" (1 MTS 19-20).

Continuing his testimony, Agent Dawson described what a "hash value" was: he characterized it as "a DNA to a file. A DNA number, if you were to put a serial number on a file…," that it was like "an identifying number for a file" and unique to each file (1 MTS 21). From this he concluded that if two files had the same hash value, they are the same file with 99% certainty (1 MTS 21).

On cross-examination Agent Dawson attested to the reliability of Det. Brownlee as informant in securing search warrants (1 MTS 22).

Kevin Brownlee

Kevin Brownlee stated that, although he was now self-employed as a licensed private investigator, he had previously worked for the Longview Police Department as a detective in their Cyber Crimes Unit and was so working during the months of March, April, and May 2013 (1 MTS 23-24). His salary was paid through a grant funded through the U.S. Attorney's Office;

5

he received benefits from the Longview Police Department (1 MTS 24-25). His office was in the Longview Police Department and he worked out of that office (1 MTS 25). He was involved in an investigation of Appellant. He looked for IP addresses that were on various peer-to-peer networks trading known child pornography files, known by their SHA-1 hash values. There is a nationwide system maintained by the National Center for Missing and Exploited Children for use by law enforcement agencies across the country; when it sees a match, it keeps track of the matched file and also the IP address, date and time it is seen on the network. For those target IP addresses that have been seen with known files, he sends subpoenas and moves forward with an investigation (1 MTS 25-26).

Brownlee stated that he had been doing these sorts of investigations since 1994, as well as other duties, and had received special training in this sort of investigation while working for the Texas AG office in Austin, becoming certified in the work, and other continuing education and training (1MTS 26-27). He began work investigating Appellant on April 24, 2013, though he had seen his IP address once before on the "CPS Network." He had subpoenaed the IP address on that date (1 MTS 27). The network lists the users in the order of the quantity of files, from the most being on the top of the list to the least at the end of an 800 page list, thus giving the investigators a priority of targets (1 MTS 28).

Brownlee acknowledged that his portion of the information in the affidavit was "developing the lead" (1 MTS 29).He went on to say:

"I type in the portion of my investigation for the affidavit and then Agent Dawson fills in all of the definitions and all of the rest. Federal affidavits are pretty lengthy. They're very different from State affidavits that I'm used to, so Agent Dawson helps with all of the lengthiness of that, all of the different things required in the Federal system that I'm not aware of." (1 MTS 29).

Brownlee used a service called "Maxmind" to locate the provider that owns the IP address in order to get an administrative subpoena for the records of the  IP address (1 MTS 29-30). Brownlee stated that in the beginning of the investigation, he sat in his office by himself going through the search of IP addresses that are sharing the child pornography files; then he found out who the internet provider was; then got the administrative subpoena to discover "who the subscriber was for that exact date and time of that IP address issued, who the subscriber was, and that's what I requested" (1 MTS 30-31). That was for the dates: March 16, 2013, to April 24, 2013; those dates were selected because they were the "exact dates and times the CPS system saw that IP address on the peer-to-peer network offering known files of child pornography for download to others" (I MTS 31). Although Brownlee did not see the IP address on those dates sharing child pornography,  he knew the data in the

7

CPS system was reliable from multiple investigations of such matters, and he knew that CPS saw the data on those dates and times with the known files (1 MTS 31).

Brownlee received the return of the subpoena on May 8 and thereby got the address of 3368 Rupe Hoffman Road (1 MTS 32). He then contacted the DPS Fusion Center in Austin to run a search on the occupants of that address (1 MTS 32). He then drove by the address on May 13 and took some pictures for the search warrant and for "general preplanning" (1 MTS 33). The next day he completed a draft of his part of the search warrant affidavit, sending it to Agent Dawson; that same day, May 14, 2013, the warrant was signed, but it was executed on May 22, 2013 (1 MTS 33).

There was a "preoperational" meeting at LPD, prior to executing the warrant, where members of the LPD and Secret Service were present; perhaps some persons from the Gregg County Sheriff's office were there as well (1 MTS 33). They met agents from the Harrison County Sheriff's office at the location, who participated in the execution of the search warrant (1 MTS 34). Agent Todd Hiles of the Secret Service was "technically the case agent" (1 MTS 34). After the search of the house, Brownlee went with Agent Hiles to Capacity of Texas, Appellant's workplace, and met him there, speaking to him in the back of an unmarked law enforcement car (1 MTS 34-35). Those two

interviewed Appellant; however, Brownlee did most of the questioning (1 MTS 35).

Then on May 30, 2013, Brownlee and Det. Taylor went to J. P. George to get an arrest warrant for Appellant (1 MTS 35-36).

Testifying further about the vagaries of forensic analysis of internet addresses, Brownlee stated that the IP address in this case was dynamic, not static, and subject to change (1 MTS 36). The data he was asking for were for the dates of March 16, 2013, to April 24, 2013; however, he could not be certain that IP address was registered to a user at Appellant's address on any other dates, including May 8; Brownlee did not get another subpoena for the IP address on May 8 to see if it had changed (1 MTS 37-38). Looking at a certain portion of the affidavit, Appellant's Counsel referred Brownlee to the part where it mentioned May 8, 2013, and where it then states that "approximately 1100 hours Detective Brownlee identified a computer using the IP address as we've talked about which was actively advertising files for sharing on the Gnutella Network which appeared to be child pornographic in nature by their names." (*see*, Affidavit at p. 9 of that document, paragraph 26, Supp. CR 15).

Then there was this colloquy between Trial Counsel and Brownlee:

Q:     Was this portion of your investigation conducted on May 8th?

A:   I would have conducted it earlier in the investigation….

Q:   So you would have identified this IP address advertising files for share prior to May 8th, but it's not listed in the affidavit?

A:   Correct.

Q:   And you believe you did it again in May 8th?

A:   It's very possible I could have.

Q:   Do you remember?

A:   I don't remember. It's been over a year.

Q:   Now, whenever you went on there and saw that IP address advertising files for sharing on the Gnutella network, whether it was May 8th or prior, this affidavit says that, due to conditions beyond Detective Brownlee's control, a connection to the computer at the above IP address was not possible during the timeframe he was on the internet, so he was unable to download any files of child pornography from the suspect IP; is that correct?

A:   That's true.

Q:   But you don't remember which date it was that you ran into this difficulty?

A:   I have a law enforcement software that's set up on my computer that scans automatically. It's not something I have to sit there and do. It does it for me, so I could get downloads on a Saturday night at 11:30 p.m. or I could get one Monday morning at 4:00 a.m. The computer's automatically looking for

10

those IP addresses. I was never able to get a download. I set the computer up to do that. If it doesn't get a download, then I don't get a download.

Q:     So the software does that for you automatically?

A:     Yes, sir.

Q:     what software is it?

A:     It's Ephex is the name of it.

Q:     How do you spell that?

A:     E-P-H-E-X.

Q:     So you don't know during what time period a connection was attempted to the suspect IP address?

A:     No, sir, I don't.

Q:     So you don't know if it was between March 16 and April 24th?

A:     I don't have that information with me, no.

Q:     And you don't know if it was after April 24th?

A:     No, sir.

Q:     So at any time during your investigation, were you able to download any files with child pornography from IP address 70.54.37.233 (sic)?

A:     254, no, sir.

(1 MTS 40-42)

Then, further:

11

Q:    So do you know what client software you believe IP address 70.54.37.233 (sic) was using?

A:    No, sir.

Q:    And do you know if that IP address was on the Gnutella network or on the eD2K network?

A:    CPS identified it to me as known files of child pornography. It could have been on either one eD2K or Gnutella. I know it wasn't on Ares or one of those --- those aren't monitored by the system.

Q:    If you didn't download any files of child pornography, how did you determine that the IP address that we've already mentioned was sharing child pornography?

A:    Through the browse that this CPS system had made of the files at that IP address."

(1 MTS 43-44)

The witness then stated that, because he was unable to obtain files from Appellant, he relied instead on "the certainty of the SHA-1 values in the data basis" which were verified "by taking the SHA-1 values, plugging them into the data base and seeing the actual image of what the image was" (1 MTS 45).

On cross-examination, Brownlee said that he was then working for a Federal task force called the North Texas Internet Crimes Against Children

12

Task Force, with persons from the Dallas Police Department, several smaller police agencies, the U.S. Secret Service, U.S. Attorney's office, Homeland Security and the FBI (1 MTRS 47-48). The Secret Service was directing his efforts (1 MTS 48-49). When he served the search warrant, he was accompanied by Special Agent Todd Hiles of the Secret Service (1 MTS 49). At the time of his interview, Appellant was not, according to Brownlee, under arrest, not in custody, was free to leave, and was not handcuffed or restrained; he was released at the end of the interview; he made incriminating statements during the interview and confessed to possessing child pornography (1 MTS 50-51).

Following the interview, Brownlee returned to the address where the search was being conducted and seized computers and hard drives, which were analyzed forensically, yielding child pornography (1 MTS 51).

On re-direct examination, Brownlee state that he did receive benefits from the LPD (Longview Police Department): health insurance, life insurance, and retirement (1 MTS 55). Brownlee recited his positions with LPD, culminating in a position in the C.I.D. His office was in the LPD; his badge said LPD during the time of this case (1 MTS 55-56). No one from the Secret Service directed him to investigate the specific IP address coming from Appellant's home at 3368 Rupe Hoffman (1 MTS 56-57).

On re-cross Brownlee testified that the case was initially going to be presented to the U.S. Attorney's office for prosecution, but that because of a report of Appellant's suicide attempt, the case was referred to the State for prosecution, since the Federal agents saw an issue of competence that they did not want to have to address in the Federal system (1 MTS 59).

Both sides then argued the merits for and against the Motion to Suppress, and the Trial Court entered its written order denying relief (CR 35).

GUILTY PLEA

On November 21, 2014, the parties appeared, and Appellant was duly sworn (2 MTS 4). The State offered State's Exhibits 1-5, which were admitted without objection (2 MTS 5). [1]

Exhibit No. 1 ("Felony Waivers… Stipulation of Evidence" Ex. Vol, p. 1 ff.) contained a judicial confession to the 30 counts of possession of child pornography. Appellant stated that he understood the nature of the allegations against him, the level of felony offense (third degree) for each of those 30 counts, and the punishment range for each count if the Trial Court found him guilty (2 MTS 8-9).

Exhibit No. 2 ("Written Felony Admonitions to the Defendant", Ex. Vol., p. 10 ff.) was a document, stating that there was no plea agreement, and

---

[1] The Court Reporter has reported/transcribed this hearing as Volume 2 of the Motion to Suppress, even though there is no continuation of that proceeding therein. However, to avoid confusion, the hearing on the guilty plea will refer be cited as "2 MTS."

Appellant stated he understood that; he also further stated that he understood that he was waiving his rights to a jury trial on both guilt/innocence and on punishment, and that he would not be able to withdraw either his plea or the waiver of jury trial from that point forward (2 MTS 9-10).

The Trial Court then admonished Appellant about deportation. Then Appellant told the Trial Court about his mental health history, but stated that there was nothing in that to keep him from understanding the nature and consequences of what was occurring in court. (2 MTS 10-11). Before the Trial Court entertained the formal guilty plea to the 30 counts, Trial Counsel made it clear that the plea was subject to the Motion To Suppress; the State and Court concurred (2 MTS 12-13).

Then Appellant entered his guilty plea to counts 1 through 10 and counts 11-30 of the indictment (2 MTS 13).

The State then asked the Trial Court to take judicial notice of the file and of Exhibit 6, the flash drive containing the evidence of 30 separate images of child pornography; it was admitted without objection, with the Trial Court noting that it had reviewed those images (2 MTS 13-14). The State then rested its case. (2 MTS 14).

Appellant took the witness stand (2 MTS 14-15). Appellant went through school through the 10th grade, had his GED, and also took a two year course in computer repair in the mid 90's (2 MTS 16). That covered the

15

physical components of a computer, but not the software or programs that ran the computer, other than installing Windows; there were no classes specific to the internet, which was a separate class (2 MTS 16-17). He had no training in peer-to-peer networks; networks like eMule or Limewire were not around then (2 MTS 17). Appellant then described his various types of employment over the years, and that his last job was as a welder for six or seven years at Capacity, where he was working at the time of his arrest (2 MTS 18). He had been married and divorced twice and had two adult daughters (2 MTS 19). At the time of arrest, he lived in his mother's home with his mother, his youngest daughter, Patricia, and his brother (2 MTS 19). He had lived there since around 1994 or 1995 (2 MTS 20).

Appellant had a limited criminal history, with two DWIs and no felony convictions (2 MTS 20). He once again admitted his guilt (2 MTS 21); he stated that he had been looking at child pornography for about two years before his arrest (2 MTS 22); he used the pee-to-peer networks of various names: Limewire, eMule named as two (2 MTS 23). Appellant stated that he had never intended to share his files with others and had never offered to sell the files for money or traded files (2 MTS 24-25). He had not kept track of the number of files he had downloaded but did not dispute the State's accounting that he had around one thousand files (2 MTS 25-26).

16

Appellant further testified that he had never touched a child inappropriately or been accused of that; nor would he ever try to do so (2 MTS 26).

Appellant requested that the Trial Court place him on probation, that he would continue to live at his mother's house, that he would agree to have limited or no computer access and to submit to polygraph testing, that he believed he could regain work as a welder and had the means of purchasing suitable transportation to get and hold work (2 MTS 27-28).

On cross-examination Appellant told how he came upon child pornography while searching on-line for a leisure sports magazine (2 MTS 30). He made efforts to find child pornography on-line (2 MTS 31). The ages of the children were not just teenagers but very young children also (2 MTS 32). He denied that he knew anyone who was making the images or that he had any contact with them (2 MTS 33). He denied ever placing the images on a smart phone or taking it with him anywhere (2 MTS 33). Appellant denied that his family knew what he was viewing (2 MTS 34).

Dr. William Paul Andrews testified for Appellant (2 MTS 37). Dr. Andrews held a Ph.D. in clinical psychology; the parties stipulated to his expertise (2 MTS 37). As a part of his professional work, he conducts evaluations of persons in the criminal justice system for "future dangerousness" or "risk of recidivism." (2 MTS 37-38). Dr. Andrews testified

17

that the term "addiction", when used in reference to viewing child pornography, is a term that is controversial in his field; some consider it an addiction; others consider it a repetitive behavior, not meeting the definition of addiction. (2 MTS 39). The Diagnostic and Statistical Manual V (DSM-V) is the latest "code book" for mental health coding, with definitions of mental illnesses, and information concerning prognosis and information about the prevalence of different mental illnesses (2 MTS 39). The behavior of some people in watching child pornography, according to Dr. Andrews, had a "reinforcing nature to it" finding it a stimulation value. As he put it, "Anything that is linked with sexual excitement or fulfilling gets reinforced very strongly"; it is something that can be treated (2 MTS 40).

Dr. Andrews was asked to evaluate Appellant and to look for risk factors upon a plea of guilty. He reviewed a packet of materials such as the offense report, a supplemental report, a scoring on a substance abuse inventory, a criminal history, and Appellant's statement. He also interviewed Appellant and spoke with his mother and two daughters by telephone; he also interviewed one of the corrections staff at the jail (2 MTS 40-41).

The point of the assessment was not to predict future behavior, but to determine whether certain risk factors are present (2 MTS 41-42). Dr. Andrews then went through an analysis of the risk factors and concluded that Appellant was in a group where there was a low risk of recidivism (2 MTS 42-

46). He recommended treatment by sex offender treatment; use of polygraph testing to monitor compliance; and supervision (2 MTS 46-47). Treatment in prison, Dr. Andrews said, was "probably not the best help, not something that I would want for somebody like him" (2 MTS 47). Dr. Andrews believed that Appellant could effectively be treated while on probation with a "very clear treatment plan and very clear monitoring" (2 MTS 48).

Next, Mrs. Norma Jean Arnold testified for Appellant (2 MTS 59). She told the Trial Court that Appellant lived with her, and that she did not know what she would have done without his help, given her poor state of health (2 MTS 60-61). He stayed home with her from time to time, did chores around the house for her and ran errands (2 MTS 60-61). She testified that Appellant was "a good kid" growing up and "minded good" and was "very intelligent" (2 MTS 62). He worked hard as an adult on ten hour shifts (2 MTS 62). He was a good father to his children; when his daughter and her son came to live with them, Appellant built a room onto the house for them (2 MTS 63). Mrs. Arnold stated that if Appellant were granted probation, he would be welcome to live in her home (2 MTS 63). She then stated that Appellant was helpful to others in many ways, such as repairs to a car or a computer. She did not think he would be a danger to anyone if placed on probation, nor would he harm a child (2 MTS 64).

Both sides thereafter rested and closed evidence (2 MTS 67).

Appellant's Counsel argued against stacking sentences (2 MTS 67-69) and argued for probation (2 MTS 69), and then came back to arguing against the stacking of sentences (2 MTS 70).

State's Counsel argued that Appellant "deserved to be punished" (2 MTS 71), that the effect of 300 years would deter others who contemplate the same or similar offense (2 MTS 72). State's Counsel characterized his motion for stacking sentences (*see* CR 22) as "outrageous" and argued that it was merited (2 MTS 73).

Following a recess, the Trial Court assessed sentence in each count at eight (8) years and ordered that they run consecutively (2 MTS 74-75; CR 55).

HEARING ON MOTION FOR NEW TRIAL

On January 29, 2015, Appellant's Motion for New Trial (CR was heard by the Trial Court (1 RR). Appellant first requested the Trial Court to take judicial notice of the pleadings, testimony, exhibits, objections, and so on from the trial and pre-trial hearing; this was done (1 RR 6). After a brief recitation as to Paragraphs 1 and 4 of the Motion for New Trial (1 RR 6), Appellate Counsel then put on evidence in support of the Eighth Amendment issue (1 RR 7 ff.). Appellant offered Exhibits 1-8, which were received without objection. Exhibits 1-6 were the documents from pleas in recent Federal proceedings in convictions and sentences for the similar offense of possession of child

pornography with the component of its involving interstate commerce (1 RR 7-8). Exhibit 7 was a copy of the Federal statute, 18 USC 2252(a)(4) (1 RR 9-10). Exhibit 8 was a summary of the Federal cases, comparing the sentences and also the number of images in each case. In the case with the most images (Kelly B. Quinn; 1600 images; 4 videos) the defendant received a sentence of 78 months. That was equal to one other case (Anthony Q. Steward) and second in severity of punishment to only one other case, Mitchell D. Porter, whose sentence was 180 months. The defendant with the least amount of months in confinement was Ronald L. Strader, whose sentence was 32 months.

Counsel for Appellant then noted that, when Appellant's sentences were stacked, assuming that a person would have to serve at least 10 months (maybe more) to be eligible for parole, then multiplying that times 30 counts, one derived 300 months or 25 years of actual time of incarceration. Since Appellant was 55 years old, then he would be 80 years old before the last count would have been disposed of for purposes of parole eligibility (1 RR 10-11).

In response to a comment by the Trial Court, Counsel for Appellant made the point that, even if one doubled the sentence given to defendant Quinn (he had 1600 images, Appellant had 3000), Quinn's sentence of 78 months of 5 and ½ years -- times two -- would still be much less than Appellant's (1 RR 11).

21

The State then placed various decisions, both Federal and State, before the Trial Court, arguing that Appellant's sentence was not disproportionate (1 RR 12-16).

Counsel for Appellant then urged that the Trial Court grant a new trial (1 RR 17-18). He also requested and obtained leave of court to file a letter brief on the *Reynolds*[2] case, and the Trial Court took the matter under advisement (1 RR 19-20).

The Motion for New Trial was overruled as a matter of law, and the case now comes before this Honorable Court.

## SUMMARY OF THE ARGUMENT

THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO GRANT THE MOTION TO SUPPRESS EVIDENCE, SINCE (A) THE EVIDENCE IN THE AFFIDAVIT WAS STALE AND (B) DETECTIVE BROWNLEE WAS A STATE EMPLOYEE AND THE "SILVER PLATTER" DOCTRINE (OR ITS REVERSE) DID NOT APPLY. THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENT GIVEN TO OFFICERS IN THEIR PATROL CAR, SINCE HE WAS NOT READ HIS MIRANDA WARNINGS AND WAS, IN FACT, RESTRAINED AGAINST HIS WILL. THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO FIND THAT APPELLANT'S SENTENCE VIOLATED THE EIGHTH AMENDMENT AND TEXAS CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT, SINCE HIS CUMULATIVE SENTENCE AMOUNTED TO 240 YEARS, AND, IN COMPARISON WITH SIMILAR FEDERAL OFFENSES, HIS SENTENCE WAS GROSSLY DISPORPORTIONAL.

---

[2] *Reynolds v. State*, 430 S.W.3d 467 (Tex. App. – San Antonio 2014, no pet.).

22

# ARGUMENT AND AUTHORITIES

## FIRST ISSUE, RESTATED

THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS. THE EVIDENCE CONTAINED IN THE AFFIDAVIT WAS STALE AND/OR UNRELIABLE, THEREBY FAILING TO ESTABLISH PROBABLE CAUSE FOR ISSUANCE OF THE WARRANT

## SECOND ISSUE, RESTATED

THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE MOTION TO SUPPRESS, SINCE DETECTIVE BROWNLEE WAS AN EMPLOYEE OF A STATE LAW ENFORCEMENT AGENCY AND THE "SILVER PLATTER" DOCTRINE (OR ITS REVERSE) DOES NOT APPLY; HENCE, STATE LAW, NOT FEDERAL LAW, GOVERNED THE VALIDITY OF THE SEARCH WARRANT

Appellant filed his "Motion to Suppress" on March 14, 2014 (CR 30-34). A hearing was held on that motion, as reported above (Brief, pp. 2-15).[3] A true copy of the Motion is attached as Appendix I for ease of reference.

THE LAW

In the Motion Appellant sets out the reasons that the search warrant was defective and cites to the relevant constitutional and statutory authorities for its defectiveness, namely, the Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 9, 10, and 19 of the Texas

---

[3] Since these two issues have a common factual and legal nexus, they are argued together for the sake of judicial economy and brevity.

Constitution, and Art. 38.22 and 38.23, TEX. CODE CRIM. PRO., as well as Art. 18.06 and 18.07, TEX. CODE CRIM. PRO., and the precedent of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983).

In reviewing a ruling in a motion to suppress the reviewing court uses a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex, Crim. App. 2000). The trial court's decision is reviewed under an abuse of discretion standard. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). Almost total deference is given to the trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo of the trial court's application of the law to facts not based upon an evaluation of credibility or demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing a trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or disbelieve all or any part of a witness' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). However, a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004). Thus, a failure by a trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

24

Where the trial court fails to file findings of fact and conclusions of law, the reviewing court views the evidence in the light most favorable to the trial court's ruling and assumes that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Ross*, 32 S.W.3d at 855; *see, State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011). Therefore, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence." *Castleberry*, 332 S.W.3d at 465. Since all evidence is viewed in the light most favorable to the trial court's ruling, the reviewing court is obligated to uphold it ruling on a motion to suppress if that ruling is supported by the record and is correct under any theory of law applicable to the case. *Ross*, 32 S.W.3d at 856; *Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999); *Maysonet v. State*, 91 S.W.3d 365, 369 (Tex. App. – Texarkana 2002, pet. ref'd).

Amend. IV, U.S. CONST., states, in relevant part:

"…[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."

Art. 1, Sec. 9, TEX. CONST., states, in relevant part:

"The people shall be secure in their persons, houses, papers, and possessions, from all unreasonable seizures or searches, and no warrant to

25

search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

It has been held that the State's Constitutional provision against warrantless searches is not to be bound by United States Supreme Court decisions interpreting the Fourth Amendment. Art. 1, Sec. 9, TEX. CONST., can provide additional rights to its citizens; the Federal constitution sets the floor; the State constitution establishes the ceiling. *Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).

Finally, there is a concept called the "silver platter" doctrine, derived from *Lustig v. United States*, 338 U.S. 74 (1949), holding that evidence independently obtained by state officials in compliance with state law, but in violation of federal law, could be handed over on a "silver platter" to federal agents for use in a federal criminal trial; protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity. The case is cited in *State v. Toone*, 823 S.W.2d 744, 748 (Tex. App. – Dallas 1992), *aff'd on other grounds*, 872 S.W.2d 750 (Tex. Crim. App. 1994). In *Toone*, the Court of Appeals reversed a ruling of suppression, holding there that the same is true in what it called a "reverse silver platter" scenario: federal agents obtained evidence in keeping with federal law, but in violation of state law; yet the evidence is admissible in a

26

state proceeding, since their warrant was valid under federal law. However, the Court of Appeals in *Toone* qualified its holding, citing to a decision by the New Jersey Supreme Court: *State v. Mollica*, 114 N.J. 329, 554 A.2d 1315, 1328 (N.J. 1989):

" '…[w]e endorse the principle that federal officers acting lawfully and in conformity to federal authority are unconstrained by the State Constitution, and may turn over to state law enforcement officers incriminating evidence, the seizure of which would have violated state constitutional standards.' …federal agents may not act as agents of the state police or under 'color of state law.' Id. at 1329. Evidence of antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may establish agency and serve to bring the conduct of the federal agents under the color of state law. Conversely, mere contact, awareness of ongoing investigations, or the exchange of information may not transform the relationship into one of agency. Id."

ANALYSIS

Trial counsel's Motion to Suppress sets out several arguments against the validity of the search warrant and the search. *See*, in particular, though not exclusively, the contents of Paragraph 6 of the Motion, at CR 31-33. In arguing the motion, trial counsel focused on how the facts justified suppression because probable cause was lacking, the evidence was unreliable and/or stale, and because Detective Brownlee, a state agent, was the key figure in the investigation, that the investigation led to a state prosecution, and that, consequently, State law controls as to the validity of the execution of the search warrant. (I MTS 61-66).

27

Detective Brownlee was an employee of the Longview Police Department (LPD). He had his office there; his badge was an LPD badge; he received benefits through his employment there – health insurance and retirement. Although the money for his salary came from a grant, that only shows that the money came from a source other than city revenues. There never was any evidence that his check was issued from some source other than the city for which he worked. There was no evidence that his superior was an officer outside the LPD or that the chain of command was outside the LPD.

It might be countered that his activities were directed toward the furtherance of the entity called the "North Texas Internet Crimes Against Children Task Force" and that he stated that his actions were directed by the Secret Service. However, it is also true that other persons from the Dallas Police Department and several smaller police agencies worked in the same group, along with the U.S. Secret Service, U.S. Attorney's office, Homeland Security and the FBI. So he was not the lone State agent working in the program; there were other State agents as well. That means that the group was a cooperative effort by State and Federal officers. It was not a purely Federal organization, with Brownlee as the sole agent from a State department.

Brownlee decided what files to trace and which IP addresses to subject to an administrative subpoena. He used equipment in his office at the LPD; one is confident that his desk, his chair, his ball point pens and pencils, his

28

telephone, his computer, his printer, the toner, and the paper used to print pages --- all of it -- was supplied and paid for by the LPD and not the Federal government. The fact that the funds for his position came from a Federal grant did not make him an employee of the Federal government. If that were true, then every employee in every school and city and county and hospital in the country, or for that matter, in every aircraft plant and every munitions factory, would suddenly be categorized as being a Federal employee, because the Federal government was supplying money for schools and roads and housing and Medicaid, not to mention armament and military manufacturing, in practically every hamlet and city from Boston to San Diego. Absurd!

Detective Brownlee was a State, not a Federal, agent. As such, his work originated under State auspices, though he teamed with Agent Dawson in his investigation of Appellant. Agent Dawson, a federal agent, teamed with Detective Brownlee. It was a mutual effort: each one relied upon the other and each used the tools of his own agency. When one reads Agent Dawson's "Application for a Search Warrant" (State's Ex. 1 from the MTS hearing), he relies heavily, if not exclusively on the work of Detective Brownlee. It is safe to say that, were it not for Brownlee, there would not have been much independent, factual allegations in the Application that were particular to Appellant. Agent Dawson supplied the "boiler plate" up to paragraph 23 and then paragraphs 37-39; Detective Brownlee supplied the particulars beginning

with paragraphs 24-34. Without those, the search warrant would have been only general allegations.

Agent Dawson swore out his Affidavit and got a search warrant from Magistrate Judge Judith K. Guthrie on May 14, 2013, alleging events back on May 8, 2013. The search warrant was executed eight days later on May 22, 2013. According to Brownlee, the intent was to prosecute Appellant in the federal courts, but the case was placed in state court, ostensibly because Appellant had talked about suicide, and the federal authorities did not want to have an issue of competency or suicide in making their case (1 MTS 59). However, no evidence was developed at that hearing or at the guilty plea as to any suicide attempt by Appellant.

The time for execution of search warrants is strictly controlled by a brief window in Texas law under Art. 18.06 and Art. 18.07, TEX. CODE CRIM. PROC., the former stating that the peace officer "shall execute the warrant without delay," and the latter giving "three whole days" for its execution. *See, Gonzalez v. State*, 768 S.W.2d 436, 437 (Tex. App. – Houston [1st Dist.] 1989, no. pet.), holding that is the warrant is not executed within that time, "any search whose legality depends on the warrant is unauthorized." Same result: *Green v. State,* 799 S.W.2d 756, 759 (Tex. Crim. App. 1990).

Appellant contends that the issuance and execution of the search warrant in this case do not comport with Texas law and therefore, the trial court reversibly erred in failing to suppress on that basis.

As trial counsel pointed out in his argument, the information in the affidavit was stale and unreliable for probable cause. First, there is the problem that no law enforcement agent downloaded files from the targeted IP address believed to belong to Appellant. Also, the IP addresses are dynamic, not static; therefore, it is speculative to assume that the IP address associated with Brownlee's investigations on March 16 to April 24 remained the same IP address alleged on May 8. That meant that the information actually relied upon in the affidavit came from the earlier time frame of 3-16 to 4-24, almost 20 days before the affidavit was completed and the search warrant issued. By whatever definition of "stale" one wants to use, it certainly would fit this set of facts. *See, Lockett v. State*, 879 S.W.2d 184,189 (Tex. App. – Houston [1st Dist.] 1994, pet. ref'd), holding " ' Facts stated in an affidavit must be so closely related to the time of the issuance of the warrant that a finding of probable cause is justified at that time.' " However, the length of the delay as to staleness "depends upon the particular facts of a case, including the nature of criminal activity and the type of evidence sought. Mechanical count of days is of little assistance in this determination, but, rather, common sense and reasonableness must prevail with considerable deference to be given to the

magistrate's judgment based on the facts before him, absent arbitrariness" (*Id.*), citing to *Ellis v. State*, 722 S.W.2d 192, 196-97 (Tex. App. – Dallas 1986, no pet.). *Lockett* goes on to state (citing to *Bernard v. State*, 807 S.W. 2d 359, 365 (Tex. App. – Houston [14th Dist.] 1991, no pet.): "where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant." *Id.*

Here there was a significant passage of time from April 24, the date of the last observations on the IP address, until May 8, the date used in the affidavit, when there was no evidence that the IP address on the later date was, in fact, Appellant's IP address, given the dynamic nature of an IP address. That would place a gap of 20 days between the last date of investigation and the date of the issuance of the warrant, from April 24 to May 14. Based on the uncertainty and the changing nature of IP addresses, that length of time is not immaterial and crosses the line from supporting probable cause over into staleness.

If it be contended that the "reverse silver platter" doctrine somehow enables the State to leap frog over the State prohibition on the back of the federal efforts, that is a flawed thesis. This is the very case envisioned in *Toone*, as it cited to *Mollica*: the two agencies – federal and state – were intertwined and (quoting *Mollica*), there was "antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between

32

federal and state officers" such that agency was established and served "to bring the conduct of the federal agents under the color of state law." The actions of Detective Brownlee were not, as he would have one believe, the acts of the federal government. They were his acts, done out of his office, using his city's equipment, on the city payroll. In fact, without his acts, Agent Dawson would have had no material allegations to fill out and flesh out his affidavit with particulars. Agent Dawson's acts were blended into conduct under color of State law, so that Texas law controlled the efficacy of the search warrant; there was no "silver platter" or its reverse.

It was an abuse of discretion for the trial court not to grant the motion to suppress. The case should be reversed and remanded.

### THIRD ISSUE, RESTATED

THE TRIAL COURT SHOULD HAVE SUPPRESSED APPELLANT'S STATEMENTS TO LAW ENFORCEMENT ON MAY 22, 2013, SINCE HE WAS IN CUSTODY AND NEVER GIVEN HIS MIRANDA WARNINGS PRIOR TO SPEAKING WITH THE OFFICERS

On May 22, 2013, as related by Detective Brownlee, he and Agent Hiles went to Appellant's place of employment, stated that they had him come out of his work and talk to them in the back of an unmarked law enforcement car; Hiles was in the driver's seat, and Brownlee with Appellant in the back seat (I MTS 35). Brownlee, under questioning by the State, disavowed that Appellant

33

was under arrest or in custody or handcuffed (I MTS 50). Interestingly, however, a question was then framed like this:

Q     At the conclusion of the interview, **was he released**?

A     **He was**.

(I MTS 51, lines 2-4; emphasis added).

One must ask: Released from what? If Appellant was not in custody and not under arrest, then what was he being released from? The answer belies the contrary representation of Brownlee: Appellant was released <u>from custody</u>.

The Fifth Amendment to the United States Constitution states, in relevant part:

"...nor shall any person...be compelled in any criminal case to be a witness against himself..."

A similar constitutional provision is found in art. 1, § 10, TEX. CONST., which states, in relevant part:

"In all criminal prosecutions the accused ...shall not be compelled to give evidence against himself..." and in the Texas statue, Art. 1.05, TEX. CODE CRIM. PRO., with prohibitions against, and restrictions upon, the use of custodial statements in Art. 38.22, TEX. CODE CRIM. PRO. *Miranda v. Arizona*, 384 U.S 436 (1966).

It has been stated that "A person is 'in custody' only if, under the

34

circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. At least four general situations may constitute custody: (1) the suspect is physically deprived of his or her freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he or she cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe that his or her freedom of movement has been significantly restricted, and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect that he or she is free to leave." *Washburn v. State*, 235 S.W.3d 346, 350 (Tex. App. – Texarkana 2007, no pet.). Also, it has been held: "Although the term['arrest'] implies an element of detention, custody, or control of the accused, it is not the actual, physical taking into custody that will constitute an arrest. A suspect's submission to an officer's show of authority will also constitute an arrest." *McCraw v. State*, 117 S.W.3d 47, 53 (Tex. App. – Fort Worth 2003, pet. ref'd).

Here, Appellant was under the authority of not one but two officers operating under the aura of State power. He was not interviewed out in the open or in his workplace, but placed into the back seat of a law enforcement vehicle with one of the two agents beside him, the other in the front seat. The two agents sought him out based upon their investigations and suspicions of

35

Appellant's criminal activity. It was not a fishing expedition; the search warrant had already been issued and was in the process of being executed at Appellant's home. Surely, the focus of the investigation was on him. This was not some sort of idle questioning. Indeed, under the questioning, Appellant incriminated himself, admitting to possession of child pornography (I MTS 51).

Appellant contends that, for all the disavowals of Detective Brownlee that this was not a custodial interrogation, surely it was. The statements of Appellant should have been suppressed, as well as any evidence obtained by law enforcement as a consequence of that improper interview.

Since the error is one of constitutional dimension, one must analyze this to determine whether it can be said beyond a reasonable doubt that it did not contribute to Appellant's conviction or punishment. Rule 44.2(a), TEX. RULES APP. PROC. *See, Tijerina v. State*, 334 S.W.3d 825, 835 (Tex. App. – Amarillo 2011, pet. ref'd). It would be difficult to say here that Appellant's incriminating statement did not contribute to his conviction, since Appellant went forward with a plea of guilty, in no small measure because he had already "confessed" to the authorities. The trial court erred in not suppressing the statement. The case should be reversed and remanded for a new trial.

**FOURTH ISSUE, RESTATED**

THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE ASSESSMENT OF THIRTY CONSECUTIVE SENTENCES OF EIGHT YEARS EACH DID NOT OFFEND THE EIGHTH AMENDMENT

As set out in the Brief (*supra*, pp. 20-22), Appellant contested the assessment of thirty consecutive sentences of eight years each, resulting in a span of 240 years, and, given the vagaries of parole law and early release, may in all likelihood be, in fact, a sentence of at least 25 years before Appellant becomes eligible for parole at age 80 – in effect, a life sentence.

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The U. S. Supreme Court has held punishment can be so disproportionate to the crime committed that it violates the Eighth Amendment. In *Solem v. Helm*, 463 U.S. 277 (1983), the High Court set standards to guide a reviewing court to determine if the sentence violated the Eighth Amendment, including comparing the gravity of the offense against the severity of the sentence. If such seems to be extreme, then the Court is to compare sentences for similar crimes in the jurisdiction and sentences for the same crime in other jurisdictions. *Harmelin v. Michigan*, 501 U.S. 957, 1006 (1991). *See also, Lockyer v.*

*Andrade*, 538 U.S. 63 (2003).

For economy of argument, Appellant also contends that TEX. CONST. art. 1, § 13, carries with it the same prohibition as its Federal counterpart, U. S. CONST. amend. VIII. TEX. CONST. art. 1, § 13 states, in pertinent part:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

See also, TEX. CODE CRIM. PROC. Art. 1.09.

Several federal convictions were brought to the attention of the trial court, summarized in MNT Exhibit #8, set out in Appendix II. Additionally, the federal statutes were supplied to the trial court for comparison with the state offense (MNT Ex. 7). It is clear as crystal that, in comparison to the punishments assessed to the federal offenders, Appellant's punishment was draconian. Even State's counsel acknowledged this, calling his Motion to Cumulate Sentences "outrageous" (2 MTS 73).[4] Though most of the federal cases had multiple images (as did Appellant), in none of those cases was a sentence given that would approach Appellant's in severity. The very worst

---

[4] Appellant is compelled to view that admission of "outrageous" was a confession of error on this issue. *See, Saldano v. State,* 70 S.W.3d 873, 884 (Tex. Crim. App. 2002).

offender, Mr. Porter, was assessed 180 months or 15 years, far short of the (assumed) 25 years given to Appellant.

Aside from the Supreme Court cases already noted above, the State marshaled some case law for the trial court's review on the issue: *Reynolds v. State*, 430 S.W.3d 467 (Tex. App. – San Antonio 2014, no pet.), *Lamarre v. State,* 2013 WL 781778 (Tex. App. – San Antonio, Mem. Op. No. 04-11-00618-CR, March 1, 2013); and *McGoldrick v. State*, 2007 WL 2462035 (Tex. App. – Austin, Mem. Op. No. 03-07-00132-CR, Aug. 29, 2007). The *Lemarre* opinion is readily distinguishable because the Eighth Amendment issue was not raised for its consideration. *McGoldrick*, although it wrote on an Eighth Amendment "stacking" question and affirmed the cumulative sentence, ruled that the defendant's attempts to contrast his sentence with those of similarly situated defendants was insufficient since it did not set out a variety of information that might have made those sentences distinguishable from his own, such as the nature of the assaultive behavior, the nature of the photographs, the duration of the commission of repeat offenses, and the defendant's acceptance of responsibility. Contrasted to that lack of information, in the case at bar many of the federal cases set out a "factual resume" of the offense, signed by the defendant (*see, e.g.,* MNT Ex. No. 2) , and/or a factual basis and stipulation  signed by the defendant,

wherein he truthfully admitted to his conduct (*see, e.g.*, MNT Ex. No. 3).  So *McGoldrick* is also distinguishable.

As to the State's reliance on *Reynolds, id.*, Appellant makes the following observations:

As to defendant Reynolds (as the Court of Appeals recognized, see p. 473-74):

**First**, he was convicted 6 years after being found out by his wife and promising her he would stop…but did not. There is nothing like that in the record as to Appellant. He got no "second chance."

**Second**, there was actual interaction with minor victims, including three visits to Arkansas where one of the children lived. And Reynolds had the address of the child's middle school, though Reynolds denied having a face to face with him. Nothing like that occurred in the case at bar.

**Third**, Reynolds tried to shift the blame for his offenses onto the victims by (1) stating that they initiated contact and (2) stating that the images were not criminal. Appellant accepted responsibility for his conduct and made no denials or skewed interpretations of the images found.

**Fourth**, Reynolds had occupations that put him into contact with minors: camp counselor, camp director, youth minister at his church.

Appellant worked at an adult occupation; there is no evidence that he was ever in a position vis-à-vis children and youth like Reynolds was.

The Court of Appeals, because of those qualities found in *Reynolds*, found that the punishment was not grossly disproportionate to his crimes and therefore concluded that it need not address the other two parts of an analysis under *Solem v. Helm*, 463 U.S. 472-73.

From the foregoing comparison and contrast of Appellant to *Reynolds*, however, Appellant would contend that the circumstances of his case, as opposed to *Reynolds*, do raise the issue of his punishment being grossly disproportionate. Moreover, the confession of error by the State, that the request for stacking was "outrageous," supports that position. In the six Federal cases the worst any of those men will serve is maybe 12-15 years, while the least punitive is less than three years confinement.

**One final point**: although Reynolds was convicted and sentenced to ten years on each of eighty counts, the trial court ordered that all but eight counts would run concurrently, but as to those eight, he must serve those consecutively. Appellant was not granted a similar outcome for his thirty counts. Instead, he was sentenced to eight years on thirty counts, all of which are to be served consecutively. That is another argument that his punishment is grossly disproportionate and, in light not only of the six

41

federal cases, but in light even of Reynolds' punishment, Appellant's sentence violates the Eighth Amendment and Art. 1, Sec. 13, Texas Constitution. The case should be revered and remanded for a new trial on punishment.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, KARL PATRICK HOULDITCH, APPELLANT, prays that this Honorable Court of Appeals, upon review of the record and consideration of the issues set forth, and the argument and authorities presented, will find error and reverse and remand this cause for a new trial on guilt and innocence and/or on punishment, and for such other and further relief to which Appellant may be entitled at law and equity.

Respectfully submitted,

\_\_/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn
Attorney at Law
P.O. Box 2226
Longview, TX 75606
E-mail: dunn@texramp.net
Vox: 903-757-6711
Fax: 903-757-6712
Counsel for Appellant
Karl Patrick Houlditch

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing "Brief for Appellant" has been sent by electronic transmission to the following on this 15 day of April, 2015:

Hon. Tim Cariker, Assistant Criminal District Attorney, Harrison County, Texas, at his e-mail address: timc@co.harrison.tx.us.

__/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Rule 9, TEX. R. APP. PROC., regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 9967 words.

/s/ Hough-Lewis ("Lew") Dunn
Hough-Lewis ("Lew") Dunn

APPENDIX I: MOTION TO SUPPRESS

FILED FOR RECORD
HARRISON COUNTY TEXAS
DISTRICT COURT

2014 MAR 14 AM 10: 43

| STATE OF TEXAS | § | IN THE DISTRICT COURT CRAIG |
| | § | |
| vs. | § | 71ST JUDICIAL DISTRICT |
| | § | DEPUTY |
| KARL HOULDITCH | § | HARRISON COUNTY, TEXAS |

## MOTION TO SUPPRESS

### TO THE HONORABLE JUDGE OF SAID COURT:

Now comes Karl Houlditch, Defendant, and files this Motion to Suppress and shows the following:

1. Defendant has been charged with the offense of Possession of Child Pornography.

2. On or about May 22, 2013, the Longview Police Department, County Organized Drug Enforcement Unit, Criminal Investigations Division and the U.S. Secret Service executed a federal search warrant at the residence of Defendant located at 3368 Rupe Huffman Rd., Harrison County, Texas. As a result of the execution of said search warrant, evidence that may be used by the State at trial of this cause was seized, including 2 Maxtor hard drives, a Seagate portable hard drive, and 2 Dell desktop computers.

3. The actions of the Longview Police Department, County Organized Drug Enforcement Unit, Criminal Investigations Division and the U.S. Secret Service violated the constitutional and statutory rights of the Defendant under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Texas Constitution, and under Article 38.23 of the Texas Code of Criminal Procedure.

4. Any statements obtained from Karl Houlditch were obtained in violation of Article 38.22 of the Texas Code of Criminal Procedure and in violation of the rights of Karl

Houlditch pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10 and 19 of the Constitution of the State of Texas.

5.     Any evidence seized in connection with this case, including but not limited to 2 Maxtor hard drives, a Seagate portable hard drive, 2 Dell desktop computers, and the information contained therein, was seized without a valid warrant, probable cause or other lawful authority in violation of the rights of Karl Houlditch pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10 and 19 of the Constitution of the State of Texas.

6.     Defendant specifically shows that the search warrant at issue in this case, under which said evidence was seized, was in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10 and 19 of the Constitution of the State of Texas and under Article 38.23 of the Texas Code of Criminal Procedure, for the following reasons:

a.     The affidavit upon which the search warrant was based was improperly and illegally executed.

b.     The warrant was not executed in compliance with Articles 18.06 and 18.07 of the Texas Code of Criminal Procedure.

c.     The warrant was illegally issued for the reason that the supporting affidavit does not reflect sufficient probable cause to justify the issuance of a search warrant, in that:  (I) the affidavit lacks sufficient underlying circumstances which would permit the conclusion that the alleged contraband was at the location in which it was claimed; and (ii) the affidavit fatally fails to state sufficient underlying circumstances to establish the credibility of the affiant.

000031

d. The warrant was illegally issued because the affidavit did not show probable cause sufficient to justify the issuance of the search warrant, because the magistrate who issued the search warrant did not have a substantial basis for concluding that probable cause existed, i.e., that the alleged contraband would be found in a particular place, and thus did not meet the totality of the circumstances analysis adopted in Illinois v. Gates, 103 S.Ct. 2317, (1983).

e. The warrant was illegally issued for the reason that the information contained in said warrant and the supporting affidavit was stale.

f. The search warrant was illegally issued because the issuing magistrate failed to manifest the neutrality and detachment demanded of a judicial officer when presented with a warrant application and acted instead as an adjunct law enforcement officer.

g. The search warrant was illegally issued because the magistrate's probable cause determination reflected an improper analysis of the totality of the circumstances test when, as a matter of law, the probable cause determination was not objectively reasonable.

h. The search warrant was illegally issued because the issuing magistrate was misled by information in the affidavit that the affiant officer knew was false or would have known was false except for his reckless disregard for the truth and there is insufficient probable cause to support the search warrant without such false statements. The affidavit states that Defendant was advertising child pornography files for sharing on the "Gnutella" peer to peer network. During the video interview between Detective Brownlee and Defendant, the only file sharing they discuss Defendant using is called

000032

"Emule." Detective Brownlee stated on the video interview that they got to Defendant's house because a computer at Defendant's house using "Emule" is sharing videos of child pornography online and that's how they got to Defendant's house, and that's how they got a federal search warrant.

7. Therefore, Defendant requests that the following matters be suppressed at trial of this cause:

a. Any and all evidence seized by law enforcement officers or others in connection with the detention and arrest of Karl Houlditch in this case or in connection with the investigation of this case, including but not limited to 2 Maxtor hard drives, a Seagate portable hard drive, and 2 Dell desktop computers and any information contained therein, and any testimony by the Longview Police Department, County Organized Drug Enforcement Unit, Criminal Investigations Division and the U.S. Secret Service or any other law enforcement officers or others concerning such evidence.

b. All written and oral statements made by Karl Houlditch to any law enforcement officers or others in connection with this case, and any testimony by the Longview Police Department, County Organized Drug Enforcement Unit, Criminal Investigations Division and the U.S. Secret Service or any other law enforcement officers or others concerning any such statements.

c. Any other matters that the Court finds should be suppressed upon hearing of this motion.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the Court suppress such matters at trial of this cause, and for such other and further relief in connection therewith that is proper.

Respectfully submitted,

LAW OFFICE OF MATTHEW C. HARRIS, P.C.
P.O. Box 4373
Longview, TX 75606
Tel: (903) 757-7500
Fax: (903) 215-8467

By: _____
Matthew C. Harris
State Bar No. 24059904
E-Mail: mch@mattharrislaw.com
Attorney for Karl Houlditch

## CERTIFICATE OF SERVICE

This is to certify that on March 14 2014, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Harrison County, by hand delivery.

_____
Matthew C. Harris

000034

APPENDIX II: SUMMARY OF EXHIBITS

## SUMMARY OF EXHIBITS

| EX. | CASE NAME | NUMBER | SENTENCE |
|---|---|---|---|
| 1 | ANTHONY Q. STEWARD | 6:10CR30 | 78 MONTHS |
| 2 | JAMES B. MALONE | 6:13CR24 | 121 MONTHS |
| 3 | MITCHELL D. PORTER | 6:11CR95 | 180 MONTHS |
| 4 | RONALD L. STRADER | 6:11CR47 | 32 MONTHS |
| 5 | BARRY P. GRIFFITH | 6:13CR62 | 42 MONTHS |
| 6 | KELLY B. QUINN | 6:11CR29 | 78 MONTHS |

7    FED. STATUTES 18 USC SECS. 2252(a)(4)(B) AND 2252(b)(2)

| | NAME | NUMBER OF IMAGES |
|---|---|---|
| 1 | ANTHONY Q. STEWARD | 1 or more |
| 2 | JAMES B. MALONE | 1,275 images; 40 videos |
| 3 | MITCHELL D. PORTER | pictures & videos (number not given) |
| 4 | RONALD L. STRADER | 477 images |
| 5 | BARRY P. GRIFFITH | 55 images |
| 6 | KELLY B. QUINN | 1600 images; 14 videos |